# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

TRI-STATE ELECTRIC, INC., an Idaho corporation, and UNITED STATES OF AMERICA for the use and benefit of APEX ENTERPRISES, INC., an Idaho corporation,

        Plaintiffs,

vs.

WESTERN SURETY COMPANY, a South Dakota corporation, and SYGNOS, INC., a California corporation,

        Defendant.

SYGNOS, INC., an Arizona corporation,

        Counterclaimant,

vs.

APEX ENTERPRISES, INC., an Idaho corporation,

        Counterdefendant.

Case No. 1:14-CV-00245-EJL-REB

**MEMORANDUM DECISION AND ORDER**

The Court has before it Defendants' Motion for Partial Summary Judgment Regarding Damages Claims of Apex Enterprises, Inc. ("AEI") (Dkt. 41), Defendants' Motion for Partial Summary Judgment Regarding Damages Claims of Tri-State Electric, Inc. (Dkt. 42), AEI's Motion for Partial Summary Judgment (Dkt. 43), and AEI's Motion to Strike Declaration of R. Troy Fichtelman (Dkt. 53).

MEMORANDUM DECISION AND ORDER - 1

The parties have submitted their briefing on the motions and the matter is now ripe for the Court's review.

Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motions shall be decided on the record before this Court without oral argument. D. Idaho Loc. Civ. R. 7.1

## BACKGROUND[1]

This case involves a breach of contract and Miller Act dispute over an electrical upgrade project at the VA Medical Center in Boise, Idaho. In 2010, the United States Department of Veterans Affairs ("VA") awarded a contract to Sygnos, Inc. ("Sygnos") to improve the electrical systems at the Boise VA Medical Campus. Sygnos and AEI entered into a subcontract for the replacement of electrical switchgear and related improvements at the site ("Phase III Project"). In turn, AEI entered into a subcontract with Tri-State Electric, Inc. ("Tri-State") for a substantial portion of the electrical work on the Phase III Project. Western Surety

---

[1] Unless otherwise referenced, the following facts are undisputed.

Company ("Western Surety") is the surety for Sygnos, and it issued the required Payment Bond for the Phase III Project.[2]

In addition to the Phase III Project, Sygnos had also contracted with AEI (who had, in turn, subcontracted with Tri-State) on another project for other aspects of upgrading the electrical systems on the Boise VA Medical Campus. The contract for the other project, and the work associated therewith, preceded the Phase III Project and is commonly referred to as the "Phase I Project." Due to disputes that arose during the course of the Phase I Project, separate litigation, 1:13-cv-00209-DOC, was filed by AEI against Sygnos and its surety on the Phase I Project during the time Sygnos, AEI and Tri-State were still actively working to complete the Phase III Project.[3]

Sygnos's Prime Contract with the VA specified that the Phase III Project was to be completed within 240 days from the VA's issuance of a Notice to Proceed. The subcontract between Sygnos and AEI expressly incorporated the terms of the Sygnos/VA Prime Contract. The VA provided the Notice to Proceed on May 9, 2011. Following issuance of the Notice to Proceed, the parties

---

[2] Sygnos and Western Surety are referred to collectively as "Defendants."

[3] The aforementioned litigation culminated with a jury verdict for Sygnos and its surety in April, 2016. (1:13-cv-00209-DOC, Dkt. 145.) The jury found AEI had not proven Sygnos breached its Phase I Project subcontract with AEI. (*Id.*, Dkt. 144.)

immediately began experiencing significant delays by the VA.[4]  Such delays

included the VA failing to timely approve submittals, delays due to the lack of

necessary emergency power for the VA Medical Campus, and delays associated

with design deficiencies in the original designs for the project.[5]  Although the

Phase III Project originally had a completion target date of approximately January

6, 2012, the Phase III Project did not reach substantial completion until November

27, 2013.

Over the course of the delay period, AEI retained the services of Excell

Consulting International, Inc. ("Excell").  AEI claims it hired Excell to assist

Sygnos in communicating with and demonstrating to the VA that Sygnos and AEI

were entitled to additional compensation due to VA-caused delays to the Phase III

Project.  (Dkt. 43-1, pp. 13-14.)  AEI maintains it incurred the expense of hiring

Excell because Sygnos agreed that AEI was entitled to payment.  (*Id*.)  Sygnos

counters AEI hired Excell solely to assist it with preparing a claim for the damages

AEI purportedly suffered as a result of the VA-caused delays on the Phase III

Project.  Sygnos suggests AEI is not entitled to compensation for Excell's services

[4] The Notice to Proceed was itself substantially delayed.  While the VA contracted with Sygnos in July 2010, it did not issue the Notice to Proceed until nearly a year later, on May 9, 2011.

[5] The parties agree that the initial project delays were caused by the VA. However, Sygnos contends that AEI and Tri-State eventually contributed to delays on the Phase III Project.  (Dkt. 44-1, ¶¶ 4-19.)

because, *inter alia*, Excell was solely engaged by AEI and performed all work for AEI. (Dkt. 41-2, ¶ 16.)

Due to the substantial delay on the Phase III Project and the litigation regarding the Phase I Project, the relationship between the parties became acrimonious. Sygnos claims AEI failed to timely procure switchgear pursuant to the VA's and Sygnos's direction, and that Sygnos incurred additional unanticipated costs as a result in order to ensure the Phase III Project was properly managed to completion. (Dkt. 41-2, ¶ 18.) Sygnos also suggests AEI refused to complete additional work on the Phase III Project demanded by the VA in November 2013, and that Sygnos was forced to contract with Mountain West Power to complete the Phase III Project as a result of AEI's default. (*Id.*) By contrast, AEI maintains Sygnos demanded that it perform work beyond the scope of the subcontract, was late on payments, and refused to guarantee payment for additional work unreasonably required by the VA at the project's completion. (Dkt. 43-2, ¶¶ 17, 18.) AEI suggests Sygnos ultimately terminated the subcontract because AEI refused to perform the disputed work and "despite the fact that all work within AEI's Scope of Work had been completed." (Dkt. 43-2, ¶ 18.)

After the Phase III Project was finished, Sygnos began compiling evidence to support the damages it had incurred as a result of the VA's delay in preparation for submitting a Request for Equitable Adjustment ("REA") to the VA. Sygnos

asked AEI to compile information to support its delay damages.  In May of 2014,

Sygnos submitted REA No. 2 to the VA to recover costs associated with the

substantial delay.[6]  Sygnos contends that it attempted to obtain AEI's portion of the

Phase III Project delay damages in submitting REA No. 2, but that AEI refused to

provide essential documentation necessary to support its claim.[7]  (Dkt. 41-1, p. 3.)

Although AEI submitted a claim for $666,400 in costs purportedly attributable to

the VA's delays, Sygnos suggests it repeatedly advised AEI that it had not

provided adequate support for this amount.  (Dkt. 44-1, ¶¶ 21-25.)  When Sygnos

certified REA No. 2 in May 2014, it noted it could not verify AEI's costs, stating:

> The costs submitted herein are based on actual costs incurred by Sygnos for
> the additional work and delayed contract completion.  The costs presented
> by AEI were developed independently by AEI.  Due to the adverse actions
> of the VA, AEI has initiated legal proceedings against Sygnos, Inc. for

---

[6] REA No. 1 was submitted by Sygnos to the VA on or about May 19, 2011.  (Dkt. 43-2, n. 2.)  REA No. 1 sought payment for delay costs which resulted from delay between issuance of the Sygnos/VA contract and the Notice to Proceed.  These claims were incorporated into REA No. 2.  (*Id*.)

[7] Before the VA resolved REA No. 2, both AEI and Tri-State initiated separate litigation against Sygnos and Western Surety.  (1:14-cv-272-EJL and 1:14-cv-245-EJL.)  On June 18, 2014, Tri-State initiated the instant litigation against AEI, Sygnos and Western Surety as defendants.  Tri-State's Complaint alleges breach of contract and quantum meruit claims against AEI, unjust enrichment against Sygnos, and seeks damages from Western Surety's Payment Bond.  (Dkt. 1.)  On July 3, 2014, AEI initiated litigation against Defendants, seeking damages for breach of contract, unjust enrichment and quantum meruit against Sygnos, and under a Payment Bond claim from Western Surety.  The separate lawsuits filed by AEI and Tri-State were consolidated by Order of this Court on October 6, 2014.  (Dkt. 16.)  In September, 2014, counsel for AEI substituted in as counsel for Tri-State, despite the ongoing claims of Tri-State against AEI. (Dkt. 18.)

unpaid sums that AEI has presented in it's [sic] REA presented at TAB 20. Due to this current adversarial relationship, Sygnos, Inc. has been unable to adequately review the cost and pricing data provide [sic] by AEI.

(Dkt. 43-4, p. 60.)

The May 2014 certification concluded:

This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 2.101 of the Federal Acquisition Regulation (FAR)) submitted, either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officer's representative in support of REA # 2 are accurate, complete and current as of March 23, 2014; except for those costs submitted independently herein by AEI.

(*Id.*, p. 62.)

When the VA failed to timely respond to the May 2014 certification, Sygnos

converted REA No. 2 to a claim under the Contract Disputes Act, 41 U.S.C.

§ 7101, by letter dated July 23, 2014.  (Dkt. 43-6, pp. 10-11.)  The July 23, 2014

letter contained the following certification by Sygnos's President:

I certify that the claim is made in good faithy [sic]: that the supporting data as [sic] accurate to the best of my knowledge and belief; that the amount requested of $1,243,217 accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

(Dkt. 43-6, p. 12.)

On January 13 and 14, 2015, Sygnos met with representatives from the VA

to negotiate the claims of Sygnos and its subcontractors.  Following the

negotiations, the VA agreed to pay only a portion of the damages claimed by

Sygnos, AEI and Tri-State. Specifically, the VA agreed to pay Sygnos a total of $645,000.00. The VA estimated $304,641.01 of the total award of $645,000.00 in subcontractor costs. (Dkt. 41-7, pp. 13-14.)

On summary judgment, AEI suggests Sygnos should be judicially estopped from asserting that AEI is not entitled to at least the $304,641.01 of delay damages awarded by the VA to Sygnos for subcontractor costs. AEI also seeks unpaid sums Defendants allegedly owe under the AEI subcontract. Defendants do not dispute that AEI is entitled to delay damages, but suggest genuine issues of material fact preclude summary judgment on the extent of damages to which AEI is entitled. Defendants also seek summary judgment finding AEI is not entitled to recover fees AEI paid to Excell, an award of partial summary judgment capping AEI's potential damages to the amount awarded by the VA, and judgment as a matter of law precluding any determination of liability for Defendants for any damages asserted by Tri-State.

## STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides that judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and that the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). According to Rule 56, an issue must be both "material" and "genuine" to preclude entry of summary judgment. An issue is "material" if it affects the outcome of the litigation. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975). That is, a material fact is one that is relevant to an element of a claim or defense which might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

On the other hand, an issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute… to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn*, 523 F.2d at 464 (*quoting First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Because factual disputes are to be resolved at trial, in ruling on summary judgment motions, the court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. Moreover, all inferences must be drawn in the light most favorable to the nonmoving party. *Id.* at 631.

Where, as here, the parties both move for summary judgment, the court will consider each motion on its own merits. *Fair Housing Council of Riverside Cnty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). In ruling on cross-motions, the court will consider the entirety of each party's evidentiary submission, regardless of which motion (or opposition) the evidence accompanied. *Id.* at 1136-37.

## ANALYSIS

### I.    AEI'S Motion for Partial Summary Judgment (Dkt. 43)

AEI seeks entry of partial summary judgment on its breach of contract and unjust enrichment claims against Sygnos, and Miller Act claim against Western Surety. AEI also moves for dismissal of Sygnos's counterclaim for breach of the covenant of good faith and fair dealing.

### A.  Breach of Contract and Miller Act Claims

AEI asks that the Court award summary judgment on its breach of contract claim against Sygnos, and its Miller Act claim against Western Surety, in the amount of $83,292.24. AEI also seeks a determination that Sygnos is obligated to pay AEI at least $304,641.01—the amount the VA paid Sygnos to compensate its subcontractors—for the delay and disruption damages incurred by AEI. AEI claims it is entitled to summary judgment finding it may recover at least

$304,641.01 against the Payment Bond for delay and disruption damages incurred by AEI and Tri-State.

The Miller Act, 40 U.S.C. §§ 3131-3134, governs surety bonds on federal construction projects that cost more than $100,000. Under the Miller Act, a contractor must post both a performance bond and a payment bond for a project. 40 U.S.C. § 3131. Every person "that has furnished labor or material in carrying out work" on a project covered by the Miller Act, who "has not been paid in full within 90 days after the day on which the person did or performed the last of the labor" may bring suit on the payment bond "for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due." 40 U.S.C. § 3133(b)(1).

State law controls the interpretation of Miller Act subcontracts to which the United States is not a party. *U.S. for Use and Benefit of Reed v. Callahan*, 884 F.2d 1180, 1185 (9th Cir. 1989). Here, the contract at issue is the subcontract between AEI and Sygnos. Because the VA is not a party to that subcontract, the law of the forum state of Idaho governs the interpretation of the subcontract under AEI's Miller Act claim. *Id*.

Under Idaho law, the elements of a breach of contract are: "(a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages." *Edged in Stone, Inc. v. Nw. Power Sys., LLC*,

321 P.3d 726, 730 (Idaho 2014) (citing *Mosell Equities, LLC v. Berryhill & Co., Inc.*, 297 P.3d 232, 241 (Idaho 2013)).

Defendants do not dispute that Sygnos and AEI had a valid contract whereby AEI agreed to provide certain labor, materials and services to Sygnos in connection with the Phase III Project in exchange for payment.  (Dkt. 43-2, ¶ 2; Dkt. 41-2, ¶ 5.)  Defendants also admit that the Phase III Project was delayed in part by the VA, and that AEI suffered damages as a result of the VA's delays.  (Dkt. 44, pp. 3-4.)  However, Defendants dispute the amount of AEI's damages and the compensability of certain of those damages due to AEI's alleged breach of the subcontract.  (Dkt. 44, p. 6.)  Thus, the second and fourth elements of AEI's breach of contract claim are at issue on summary judgment.

    1.    *Breach*

AEI suggests it is entitled to $83,292.24 as the balance due and owing on its subcontract with Sygnos because "AEI completed its obligations under the Subcontract on or before November 27, 2013" and "Sygnos has failed and refused to pay AEI the $83,292.24 balance of the Subcontract price."  (Dkt. 43-1, p. 5.)  Sygnos counters AEI defaulted on its obligations under the subcontract in several respects, including by failing to timely order the switchgear necessary for completion of the Phase III Project, by refusing to complete disputed punch list

items required by the VA to finish the project, and by failing to cooperate and provide Sygnos with requested supplemental information relating to REA No. 2.

With respect to its purported failure to timely order switchgear, AEI argues: "The switchgear was ultimately delivered on or about July 8, 2013 and thereafter work was performed to substantially complete the Project by October 7, 2013." (Dkt. 43-2, ¶ 14.)  In support of this contention, AEI cites the declaration of Dan Sweig, AEI's President, and an e-mail from Sygnos's project superintendent dated October 7, 2013 stating, "Sygnos, Inc., has reached a point of substantial completion of performance for the 'Electrical Corrections of Phase 3' contract. We formally request that the Government schedule a final walk through for generation of the final punch list as soon as possible." (Dkt. 43-7, ¶ 25; Dkt. 43-8, Exhibit 9.)

Sygnos counters that although the switchgear was delivered by July 8, 2013, AEI significantly delayed the Phase III Project by failing to order and deliver the switchgear until that date.  Specifically, the VA issued Modification No. 5 authorizing funding for, and providing instructions to, Sygnos to order the switchgear necessary for the completion of the Phase III Project on September 27, 2012.  (Dkt. 44-1, ¶ 2.)  On January 14, 2013, the VA issued a Show Cause Notice, asserting Sygnos was not "properly discharging [its] duties in accordance with the signed contract" because it "had not ordered the required switchgear package."

(*Id.*, ¶ 3.)  On February 20, 2013, Sygnos sent a letter to AEI directing AEI and/or its subcontractors to immediately order the switchgear equipment.  (*Id.*, ¶ 4.) Sygnos stated the switchgear must be delivered no later than April 30, 2013.  (*Id.*) Although AEI immediately responded that the switchgear had been ordered, Sygnos learned nearly three months later that AEI still had not ordered the switchgear.  (*Id.*, ¶¶ 4-12.)  On May 16, 2013, Sygnos delivered AEI a letter reminding it of its contractual obligation to comply with the project schedule and to manage its subcontracts and suppliers accordingly.  (*Id.*, ¶ 12.)  On May 17, 2013, contrary to its prior representations that it had already ordered the switchgear for the Phase III Project as of February 20, 2013, AEI delivered a letter to Sygnos demanding prepayment for the switchgear and indicating, the "gear order will not be shipped until funds are in our account."  (*Id.*, ¶ 13.)  Sygnos argues neither Sygnos, nor, in turn, AEI, had any right under their respective contracts to demand pre-payment.  (*Id.*, ¶ 14.)  Under the applicable regulations, payment could only be demanded upon completion of work.[8]

---

[8] AEI's subcontract with Sygnos incorporated the terms of the Sygnos Prime Contract with the VA.  (*Id.*, ¶ 14.)  The VA/Sygnos Prime Contract was governed by Federal Acquisition Regulation 52.232-5, which reads: "The Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer." FAR 52.232-5.

The parties agree AEI delivered the switchgear on July 8, 2013.  (Dkt. 43-2, ¶ 14; Dkt. 44-1, ¶ 16.)  Sygnos maintains this delivery was substantially delayed, and that it incurred additional unanticipated costs to defend against the VA's threat of termination and to ensure that the Phase III Project was properly managed to its completion.  (Dkt. 44-1, ¶ 19.)  Sygnos sent notice of these additional costs to AEI on December 10, 2013.  (*Id*.)  Sygnos suggests the additional costs it incurred as a result of AEI's delay in ordering the switchgear exceed the $83,292.24 AEI claims is due and owing under the subcontract.  (*Id*.)

In addition, Sygnos notes the VA completed its walkthrough of the Phase III Project on October 17, 2013, but required Sygnos to complete additional work to finish the project ("punch list items").  (*Id*., ¶ 17.)  Although it appears both AEI and Sygnos disputed whether the punch list items were within the scope of work of the Prime Contract, Sygnos chose to complete the punch list items and submit a REA for the additional work.  (Dkt. 43-6, pp. 3-5; Dkt. 43-4, pp. 17-18.)  Sygnos asked AEI to complete the disputed punch list items as soon as possible.  (Dkt. 43-4, p. 64.)  AEI responded that it would not complete the punch list items unless it first received immediate payment for August and September, 2013, and would only complete such work if Sygnos would guarantee payment to AEI no later than 10 days after completion of the work.  (*Id*.)  AEI also demanded, "[p]ayment to AEI is not contingent upon Sygnos receiving payment from the government."  (*Id*.)

As Sygnos notes, requiring Sygnos to guarantee payment to AEI for the punch list items irrespective of whether Sygnos received payment for such work from the VA was not required under the subcontract. Indeed, the subcontract specifically provided: "It is agreed by [Sygnos] and [AEI] that payment from [the VA] and receipt thereof is a condition precedent to any obligation of payment by [Sygnos] to [AEI]. [Sygnos] shall have no obligation to make payments to [AEI] until payment is received from [the VA]." (1:14-cv-00272-EJL-REB, Dkt. 5, p. 15.)

Further, Sygnos was required under the Federal Acquisition Regulations ("FAR") to complete the Phase III Project pending final resolution of any REA. FAR 52.233-1(i) (stating a contractor "shall proceed diligently with the performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.") Sygnos maintains that due to AEI's refusal to complete the punch list items, it was forced to terminate AEI's subcontract and hire Mountain West Power to complete the Phase III Project. (Dkt. 44-3, ¶ 18.)

Finally, Sygnos suggests AEI breached the subcontract by failing and refusing to cooperate and provide Sygnos with requested supplemental information relating the REA No. 2. Sygnos provides evidence of its repeated requests to AEI to submit support for AEI's damages claim of $666,400. (Dkt. 44-1, ¶¶ 20-29.)

As a result of AEI's purported failure to submit adequate documentation in support of its delay damages, Sygnos excluded AEI's costs from its May 2014 certification of REA No. 2 to the VA. (Dkt. 43-4, p. 62, stating "the cost or pricing data… are accurate, complete and current as of March 23, 2014; except for those costs submitted independently herein by AEI.").

Idaho law recognizes that where a party's breach of contract is material, the other party's performance is legally excused. *Melaleuca, Inc. v. Foeller*, 318 P.3d 910, 914 (Idaho 2014). As such, "a party sued for damages may defend on the grounds that its performance was excused by the other party's material breach." *Id*. "A substantial or material breach of contract is one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." *Ervin Constr. Co. v. Van Orden*, 874 P.2d 506, 510 (Idaho 1993). Whether a breach of contract is material is a factual question, as is whether a subcontractor substantially performed a contract. *Id*. at 513. Because Defendants have set forth facts suggesting AEI breached the subcontract, thereby excusing Defendants' liability for the balance of the subcontract, summary judgment on the breach element of AEI's Motion for Partial Summary Judgment is denied.

   2. *Judicial Estoppel*

Rather than addressing Sygnos's claims regarding AEI's alleged breaches of the subcontract, AEI instead focuses its argument on the theory that Sygnos should be judicially estopped from claiming AEI is responsible for any of the delays associated with the Phase III Project because, in its certified claim to the VA, Sygnos "unequivocally stated that *only one* party was responsible for the delays on the Project: *The Department of Veterans Affairs*. Sygnos did not assert, intimate, or even hint that anyone other than the Department of Veterans Affairs was responsible for '*all*' of the delays on the Project." (Dkt. 52, p. 2) (emphasis in original). Further, AEI notes Sygnos submitted a certified claim to the VA for damages incurred by Sygnos, AEI and Tri-State. (Dkt. 43-2, ¶¶ 23, 25.) The VA settled this claim with Sygnos for $645,000. (*Id.*, ¶¶ 26-27.) E-mail documentation produced by Sygnos indicates that, following settlement negotiations between the VA and Sygnos, the VA confirmed the amount allocated for AEI and its subcontractor was $304,641.01. (Dkt. 41-7, Ex. C, p. 13.) As such, AEI claims "judicial estoppel precludes Sygnos from asserting that AEI is not entitled to delay damages incurred by AEI and its subcontractor. Likewise, judicial estoppel precludes Sygnos from arguing that it is owed less than $304,641.01 for delay costs." (Dkt. 43-1, pp. 5-6.)

Judicial estoppel is an equitable doctrine that "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a

contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citations omitted). Federal law "governs the application of judicial estoppel in federal court." *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 603 (9th Cir. 1996). While termed "judicial," the doctrine applies to positions taken in both judicial and quasi-judicial proceedings. *Milton H. Green Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 996 (9th Cir. 2012). In addition, judicial estoppel may be applied "to positions taken in the same action or in different actions." *Samson v. NAMA Holdings LLC*, 637 F.3d 915, 935 (9th Cir. 2011) (citation omitted).

Although, in *New Hampshire*, 532 U.S. at 751, the Supreme Court instructed there are no "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," the Ninth Circuit has used a three-part test to determine whether application of judicial estoppel is warranted in a given case:

> In determining whether to apply the doctrine, we typically consider (1) whether a party's later position is 'clearly inconsistent' with its original position, (2) whether the party has successfully persuaded the court of an earlier position, and (3) whether allowing the inconsistent position would allow the party to 'derive an unfair advantage or impose an unfair detriment on the opposing party.'

*In re Hoopai*, 581 F.3d 1090, 1097 (9th Cir. 2009) (citations omitted).

Here, it is not evident Sygnos's later position is "clearly inconsistent" with its earlier position. First, as previously noted, Sygnos's certification of REA No. 2 explicitly stated that Sygnos could not and did not certify the costs independently

submitted by AEI.  (Dkt. 43-4, p. 60.)  In its May 2014 certification, Sygnos

maintained the costs submitted were, "to the best of [its] knowledge and belief…

accurate, complete and current as of March 23, 2014; *except for those costs*

*submitted independently herein by AEI*."  (*Id*., p. 62) (emphasis added).

Regardless, AEI argues Sygnos did certify AEI and Tri-State's costs in its

July 23, 2014 letter converting the May 4, 2014 certified claim into a Claim under

the Contract Disputes Act (CDA).  (Dkt. 52, p. 4) (citing Dkt. 43-6, pp. 10-14.)

AEI suggests Sygnos's president, Pat Sheely, did not qualify its certified claim

when he stated in his July 23, 2014 letter:

> I certify that the claim is made in good faithy; [sic] that the supporting data
> as [sic] accurate to the best of my knowledge and belief; that the amount
> requested of $1,243,217 accurately reflects the contract adjustment for
> which the contractor believes the Government is liable; and that I am duly
> authorized to certify the claim on behalf of the contractor.

(Dkt. 43-6, p. 12.)

However, the July 23, 2014 letter specifically converted REA No. 2 into a

claim under the CDA.  (*Id*., p. 11.)  Sygnos repeatedly advised the VA in REA No.

2 that it could not verify AEI's costs.  As Sygnos notes, nothing in the July 2014

letter, certification page signed by Mr. Sheely, or any other documentation

submitted therewith, rescinded or altered Sygnos's representations in REA No. 2

that it was unable to verify the accuracy of the cost data independently submitted

by AEI.  (Dkt. 44-1, ¶ 24.)  Since it had not been able to verify the accuracy of

AEI's claim, Sygnos stated it was simply forwarding the $666,400 in damages claimed by AEI. (Dkt. 43-4, pp. 60-62; Dkt. 43-6, pp. 10-14; Dkt. 44-2, ¶ 9.) The record on summary judgment contradicts AEI's claim that Sygnos certified AEI's costs to the Government.

Second, it is also not clear that Sygnos has taken inconsistent positions with respect to liability for delays on Project III. As the prime contractor on the Phase III Project, Sygnos was responsible for submitting requests for equitable adjustment for both itself and its subcontractors, and for seeking compensation for any delays attributable to the VA. Sygnos couldn't seek compensation for delays attributable to AEI in its request for equitable adjustment from the VA. Because REA No. 2 was solely focused on Sygnos's right to recover for the VA's delay on the Phase III Project, AEI's contention that Sygnos certified *only* the VA was responsible for the delay, is, at best, disputed. *Compare* (Dkt. 52, pp. 3-4) *with* (Dkt. 44-2, ¶¶ 9-10.)

And third, with respect to the amount of damages to which AEI is entitled, Sygnos did not take any position that AEI was entitled to a specific amount. As explained by Sygnos's President:

> Although AEI had claimed $666,400 in damages attributable to the VA's delays on the Phase III Project, it had not provided Sygnos with necessary supporting documentation to verify the accuracy of those amounts…. Sygnos negotiated with the VA in good faith and to the best of its ability, in order to obtain from the VA the best possible result, in spite of the lack of information from AEI and Sygnos's inability to certify the accuracy of the

damages claimed by AEI. In settling with the VA, Sygnos attempted to
obtain enough funding to cover all compensable claims that could be
asserted by its subcontractors; however, neither Sygnos nor the VA ever
certified that AEI (and/or its subcontractor [Tri-State]) had actually incurred
any particular amount in compensable damages. Sygnos did not have the
required evidentiary documentation to be able to verify AEI's claim, so
settlement for the $645,000.00 with the VA, including the $304,641.01, was
simply Sygnos's best effort to achieve a reasonable settlement with the VA.
Sygnos could not verify, represent or certify the accuracy of the $304,641.01
figure any better than Sygnos could verify, represent or certify the accuracy
of the original claim of $666,400 that had been submitted by AEI prior to the
settlement negotiation with the VA.

(Dkt. 44-2, ¶ 9.)

In sum, AEI has not established Sygnos's current position is clearly

inconsistent with the prior position it took before the VA.

AEI also fails to meet the second element of judicial estoppel, as Sygnos did

not successfully persuade the VA of AEI's damages claim. AEI submitted

$666,400 in damages to Sygnos, and Sygnos forwarded AEI's damages to the VA

in REA No. 2. Rather than persuading the VA to accept AEI's claimed damages,

Sygnos attempted to negotiate with the VA to obtain a settlement that would cover

AEI's and its subcontractor's damages. Far from the $666,400 AEI requested,

Sygnos only convinced the VA to award AEI and its subcontractors $304,641.01 in

damages. (*Id*.)

As to the final element of judicial estoppel, AEI has not established it would

give Sygnos an unfair advantage nor impose an unfair detriment on AEI to require

AEI to prove its damages at trial. AEI has the burden to prove every element of its

case at trial, including damages. Although the VA paid Sygnos $304,641.01 in damages earmarked for AEI, the record on summary judgment suggests Sygnos withstood damages caused by AEI which may decrease the amount of damages to which AEI is entitled. *See, e.g*., (Dkt. 43-4, Ex. 9, pp. 53-56; Dkt. 44-1, ¶ 19.) Other than through its judicial estoppel argument, AEI has not presented any evidence to dispute Sygnos's damages claim. In the absence of such evidence, AEI has not met the third element of judicial estoppel.

AEI has failed to establish any of the three elements of judicial estoppel typically applied by the Ninth Circuit. Nor can the Court find the totality of the circumstances here support application of the doctrine. Thus, the Court holds that Defendants are not judicially estopped from defending against AEI's claims in this matter.

### 3. *Damages*

Defendants challenge the amount of damages sought by AEI. Under the Miller Act, a subcontractor is entitled to recover "for the sum or sums justly due" under the subcontract. *Taylor Constr. Co. v. ABT Servs. Corp., Inc.*, 163 F.3d 1119, 1122 (9th Cir. 1998). Here, as set forth above, there are multiple questions of fact regarding the amounts claimed and the amounts recoverable by AEI. Based on the record before the Court, it is impossible to determine the amount of

damages AEI is entitled to as a matter of law. Summary judgment is premature

and is therefore denied as to AEI's Miller Act claim against Western Surety.

## B. Unjust Enrichment

AEI suggests it incurred "the substantial expense of paying Excell

Consulting to assist Sygnos in communicating with the VA and in preparation of

the first iteration of REA No. 2." (Dkt. 43-1, p. 18.) AEI alleges "[v]irtually the

entire request for equitable adjustment produced by the joint efforts of Excell

Consulting and Sygnos superintendent Antonio Carone was for the benefit of

presenting Sygnos' request for additional time (and compensation associated

therewith) to the VA, due to the VA-caused delays on the Project." (Dkt. 43-7,

¶ 45.) In total, AEI paid approximately $146,490.34 to Excell for services. (*Id*.)

Despite failing to compensate AEI for this amount, AEI alleges Sygnos included,

and received payment for, the consulting fees in its request for equitable

adjustment from the Government. (*Id*.) AEI argues Sygnos will be unjustly

enriched if it is permitted to retain the settlement proceeds obtained as a result of

its submission of REA No. 2, but does not have to reimburse AEI for the costs

incurred in preparing REA No. 2.[9]

---

[9] In its Motion for Partial Summary Judgment, AEI limited its unjust enrichment argument to Sygnos's retention of the benefit of the cost of Excell's services, and did not argue it was entitled to summary judgment on the claim that Sygnos was unjustly enriched by the total $304,641.01 Sygnos received from the VA that was earmarked for (Continued)

The doctrine of unjust enrichment "allows recovery where the defendant has received a benefit from the plaintiff that would be inequitable for the defendant to retain without compensating the plaintiff for the value of the benefit." *Cannon Builders, Inc. v. Rice*, 888 P.2d 790, 797 (Idaho Ct.App. 1995) (citations omitted). "A prima facie case of unjust enrichment consists of three elements: (1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof." *Brewer v. Wash. RSA No. 8 Ltd. P'ship*, 184 P.3d 860, 864 (Idaho 2008) (citing *Aberdeen-Springfield Canal Co. v. Peiper*, 982 P.2d 917, 923 (Idaho 1999)).

Sygnos challenges AEI's ability to satisfy each of the elements of unjust enrichment on summary judgment. Although, as will be discussed further, *infra*, there are other hurdles to AEI's ability to recover for Excell's services, the Court

---

AEI. (Dkt. 43-1, pp. 17-18.) In its Reply in support of the Motion for Partial Summary Judgment, AEI expands its argument to include a claim that Sygnos was unjustly enriched by the $304,641.01 it received from the VA on behalf of AEI and Tri-State. (Dkt. 52, pp. 10-14.) Although the Court generally need not consider arguments raised for the first time in a reply brief, *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003), the amount AEI is entitled to recover, due to its alleged breach of the subcontract, is in dispute. Summary judgment is accordingly inappropriate with respect to AEI's unjust enrichment claim—whether premised on the amount of Excell's services, or the total award Sygnos received from the VA to compensate its subcontractors.

finds disputed issues of material fact preclude summary judgment on AEI's unjust enrichment claim. First, Sygnos submitted evidence from Excell's President, Jon Balch, admitting some of the consulting services Excell provided AEI involved advising AEI how best to position itself to make a claim *against* Sygnos. (Dkt. 44-17, Exhibit I, pp. 7-9, 19-21.) However, AEI seeks summary judgment on its unjust enrichment claim in the amount of $146,490.34—the total amount of the fees it paid to Excell. (Dkt. 43-1, p. 18.) AEI can hardly be said to have conferred the total benefit of Excell's services on Sygnos when at least a portion of such services were associated with developing AEI's claim against Sygnos.

Moreover, as detailed above, the record illustrates that the product Sygnos received from AEI for submission to the VA was deficient and lacking in necessary supporting documentation. *See also* (Dkt. 41-9, Ex. E, pp. 26-27.) Rather than appreciating a benefit from AEI's portion of the REA, Sygnos argues it was hamstrung in its negotiations with the VA by the incompleteness of the information provided by AEI.

Finally, AEI suggests it would be inequitable for Sygnos to retain the benefit of Excell's services when Sygnos submitted Excell's costs in REA No. 2 and indicated some of the payments it received were for AEI's consultant costs. In support of this position, AEI points to deposition testimony of Sygnos's Senior Project Manager, Darin Walters. (Dkt. 43-2, ¶ 27.) In such testimony, Mr. Walters

stated he believed the funds allocated by the VA to AEI were for "overhead, direct cost, some profit, legal and some consulting fees" and "costs associated with delay days." (*Id*.) However, the question to which Mr. Walters provided the aforementioned response involved the overall contract award increase, and not the $304,641.01 estimate of subcontractor costs. (Dkt. 43-4, p. 3-4.) Further, none of the documents issued by Sygnos or the VA specifically allocated any part of the $304,641.01 to specific costs, including to consulting costs. (Dkt. 43-6, Ex. D, pp. 16-19.) Thus, Sygnos has presented material facts to dispute AEI's claim that it would be inequitable for Sygnos to retain the purported benefit of Excell's services. Summary judgment on AEI's unjust enrichment claim is denied.

### C. Covenant of Good Faith and Fair Dealing

AEI also seeks summary judgment on Sygnos's counterclaim for breach of the covenant of good faith and fair dealing. AEI suggests "Sygnos has not identified damages that relate specifically to the breach of the good faith covenant that, if proven, would not also be compensable as contract damages. As such, summary judgment should be entered in AEI's faith and Sygnos's claim for Breach of the Covenant of Good Faith and Fair Dealing should be dismissed." (Dkt. 43-1, p. 18.)

The implied covenant of good faith and fair dealing "is a covenant implied by law in the parties' contract. No covenant will be implied which is contrary to

the terms of the contract negotiated and executed by the parties." *Idaho First Nat. Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 863 (Idaho 1991) (citing *First Sec. Bank of Idaho v. Gaige*, 765 P.2d 683 (Idaho 1988) and *Clement v. Farmers Ins. Exch.*, 766 P.2d 768 (Idaho 1988)). A violation of the covenant occurs only when either party violates, nullifies or significantly impairs any benefit of the contract. *Sorensen v. Comm Tek, Inc.*, 799 P.2d 70, 75 (Idaho 1990).

"A violation of the implied covenant is a breach of the contract. It does not result in a cause of action separate from the breach of contract claims, nor does it result in separate contract damages unless such damages specifically relate to the breach of the good faith covenant." *Bliss Valley Foods*, 824 P.2d at 864. AEI contends Sygnos's counterclaim should be dismissed because Sygnos is not entitled to plead identical damages for its breach of contract and breach of implied covenant claims. However, as Sygnos argues, a party may plead the same damages for breach of contract, and, *in the alternative*, for breach of the implied covenant. As the Idaho Supreme Court has clarified:

> Any action by either party which violates, nullifies, or significantly impairs any benefit of the employment contract is a violation of the implied-in-law covenant. A violation of the implied covenant is a breach of contract. It does not result in a cause of action separate from the breach of contract claims, nor does it result in separate contract damages unless such damages specifically relate to the breach of the good faith covenant.
>
> [Here] [t]here is no indication of any claimed damages specifically relating to the breach of the covenant of good faith…. The jury awarded identical damages for breach of the covenant of good faith and fair dealing as it

awarded for breach of the covenant not to compete. It appears that the jury simply determined that [plaintiff] did not act in good faith when it breached the covenant not to compete, which finding is irrelevant.

In any event, [plaintiff] does not challenge the finding that it breached the implied covenant of good faith and fair dealing. The damages awarded for breach of that covenant were identical to those awarded for breach of the covenant not to compete, and those awards were in the alternative. The only challenge is to the damages awarded. Since we affirmed the award for breach of the covenant not to compete, *we therefore also affirm this alternative award for identical damages*.

*Saint Alphonsus Diversified Care, Inc. v. MRI Associates*, LLP, 334 P.3d 780, 794 (Idaho 2014) (internal quotations and citations omitted) (emphasis added).

Thus, Sygnos's claim to damages for breach of the implied covenant of good faith and fair dealing may be identical to the damages it seeks for breach of the subcontract. Although it may not recover duplicate awards, it may recover identical damages for either breach of contract or breach of the implied covenant, provided such award is in the alternative. As discussed herein, Sygnos has submitted evidence that it suffered damages as a result of AEI's breach of the subcontract. The evidence of contractual damages can also be used to support Sygnos's implied covenant claim. The Court therefore denies summary judgment on Sygnos's breach of the implied covenant of good faith and fair dealing claim.

**D. Motion to Strike Declaration of R. Troy Fichtelman (Dkt. 53)**

Finally, in responding to AEI's Motion for Partial Summary Judgment, Sygnos submitted the declaration of its damages expert, R. Troy Fichtelman (Dkt.

44-4.)  AEI seeks to strike paragraphs 10-19 of Mr. Fichtelman's declaration because his previously disclosed expert report did not contain any of the opinions set forth in such paragraphs.  (Dkt. 53-1, p. 2.)  The Court did not consider paragraphs 10-19 of Mr. Fichtelman's declaration in deciding AEI's Motion for Partial Summary Judgment.  AEI's Motion to Strike is accordingly moot and therefore denied.

## II.  Defendants' Motion for Partial Summary Judgment Regarding Damages Claims of AEI (Dkt. 41)

Defendants seek partial summary judgment holding AEI is not entitled to recover the consulting fees of Excell.  Defendants suggest AEI may not recover Excell's consulting fees under both the applicable federal regulations and the Sygnos/AEI subcontract.  Defendants also request summary judgment limiting AEI and Tri-State's claim for damages to the amount allocated and paid by the VA for damages purportedly suffered by Sygnos's subcontractors.

### A.  FAR 31.205-33

Defendants argue costs associated with Excell's work on the Phase III Project are not compensable under FAR 31.205-33.  Under FAR 31.205-33(a), costs of professional and consultant services may be recovered against the Government, subject to certain exceptions.  Section 31.205-33(d) (as now transferred to FAR 31.205-47(f)) provides consulting costs are unallowable if

incurred in connection with the prosecution of claims or appeals against the Federal Government.

In *Bill Strong Enter., Inc. v. Shannon*, 49 F.3d 1541 (Fed. Cir. 1995), the Federal Circuit Court of Appeals explained there are at least three distinct categories of legal, accounting, and consultant costs in contract cost principles: (1) costs incurred in connection with the work performance of a contract; (2) costs incurred in connection with the administration of a contract; and (3) costs incurred in connection with the prosecution of a CDA claim. *Id*. at 1549. Because the regulations identify the third category of costs as unallowable, *Bill Strong* held "costs that fall within the first and second categories are presumptively allowable if they are also reasonable and allocable." *Id*. As *Bill Strong* explained, "costs incurred in connection with contract performance or contract administration should ordinarily be recoverable because they normally benefit the contract purpose and reimbursement of these costs is in the best interest of the United States." *Id*. (internal quotation marks, brackets and citation omitted).

To assess allowability of consulting costs, the particular cost must be classified into a particular category. "Costs that are incidental to contract performance are easily discernable and usually pose no problem. However, the line between costs that are incidental to contract administration and costs that are

incidental to prosecution of contract claims is rather indistinct." *Id*. The *Bill Strong* Court further counseled:

> In classifying a particular cost as either a contract administration cost or a cost incidental to the prosecution of a claim… courts should examine the objective reason why the contractor incurred the cost. If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract cost allowable under FAR 31.205-33, even if negotiation eventually fails and a CDA claim is later submitted. On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205-33.

*Id*. at 1550 (internal citations omitted)

Sygnos argues AEI incurred Excell's fees solely to assist in prosecution of a claim against the Government, and that such fees are accordingly unrecoverable under FAR 31.205-33 and *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995). (Dkt. 41-1, p. 8.) In support of this position, Sygnos cites evidence submitted by AEI in conjunction with REA No. 2 stating "AEI has incurred Excell's costs for the purpose of presenting an REA to the Government in a manner and structure that will allow the Government to review the costs incurred by AEI, clearly see the financial impact to AEI, and allow for the recovery of said costs." (*Id*., p. 9.)

In *Bill Strong*, the Court held the reference in former FAR 31.205-33 to fees being unallowable if they are incurred in connection with "the prosecution of claims or appeals against the Government" required a pre-existing dispute between

the Government and the contractor prior to any submission of a request for

payment.  That is, a "claim" against the Government did not arise unless the

Government disputed either its liability for, or the amount of a particular claim,

prior to submission of the payment request.  In so holding, *Bill Strong* referenced

former FAR 33.201 (now FAR 2.101), which defines "claim" as:

> [1] a written demand or written assertion by one of the contracting parties
> seeking, as a matter or right, the payment of money in a sum certain, the
> adjustment or interpretation of contract terms, or other relief arising under or
> relating to the contract… [2] *a voucher, invoice, or other routine request for
> payment that is not in dispute when submitted is not a claim.* [3] The
> submission may be converted to a claim, by written notice to the contracting
> officer as provided in 33.206(a), if it is disputed either as to liability or
> amount or is not acted upon in reasonable time.

FAR 2.101 (emphasis added).

In *Bill Strong* and other cases, the Federal Circuit interpreted the above

italicized language as requiring a dispute over entitlement to or the amount of a

demand for payment before a submission could qualify as a claim.  *Bill Strong*, 49

F.3d at 1550; *see also Dawco Constr., Inc. v. United States*, 930 F.2d 872, 878

(Fed. Cir. 1991).  The Federal Circuit overruled this interpretation of "claim" in

*Reflectone*, holding "the critical distinction in identifying a 'claim' is not between

undisputed and disputed submissions, but between routine and non-routine

submissions."  60 F.3d at 1577.  The *Reflectone* Court explained:

> To read the dispute requirement of sentence [2] of FAR 33.201 as applying
> to all submissions for payment… one would have to construe *every* demand
> for payment as a matter of right as a 'routine request for payment.'

However, this is clearly not so. For instance, an REA is anything but a 'routine request for payment.' It is a remedy payable only when unforeseen or unintended circumstances, such as government modification of the contract, differing site conditions, defective or late-delivered government property or issuance of a stop work order, cause an increase in contract performance costs. A demand for compensation for unforeseen or unintended circumstances cannot be characterized as 'routine.' The Supreme Court has confirmed the non-routine nature of an REA by equating it with assertion of breach of contract. Thus, an REA provides an example of a written demand for payment as a matter of right which is not 'a routine request for payment' and, therefore, it satisfies the FAR definition of 'claim' whether or not the government's liability for or the amount of the REA was already disputed before submission of the REA to the [Contracting Office]

*Id.* at 1577 (citations omitted) (emphasis in original).

Sygnos contends: "Because AEI's own documentation reveals that its primary purpose in retaining Excell was to assist in the 'REA development,' application of the *Reflectone* decision directs a determination that Excell's costs were incurred 'in connection with the prosecution of a CDA claim' and are therefore unallowable under FAR 31.205.33." (Dkt. 41-1, p. 9) (internal citation and brackets omitted). AEI counters the Federal Circuit has specifically upheld the portions of *Bill Strong* on which it relies. (Dkt. 45, p. 6.) In *Tip Top Constr. Inc. v. Donahoe*, 695 F.3d 1276 (Fed. Cir. 2012), the Court significantly stated:

The government argues that our subsequent ruling in *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577 (Fed. Cir. 1995) (en banc) casts doubt upon the discussion of cost classification in *Bill Strong*. In *Reflectone*, we addressed when a claim arises for purposes of the CDA and overruled *Bill Strong* on this point. The discussion in *Bill Strong* regarding whether a particular cost should be classified as either a contract administration cost or a cost incidental to the prosecution of a claim, however, remains good law.

*Id.* at 1283 n. 3.

AEI argues Excell's work was directed toward furthering the negotiation process, and was thus a contract administration cost allowable under FAR 31.205-33, even though REA No. 2 eventually became a certified claim under the CDA. (Dkt. 45, p. 7.) In support of this argument, AEI cites the *Bill Strong* analysis explaining:

> In the practical environment of government contracts, the contractor and the CO [Contracting Officer] usually enter a negotiation stage after the parties recognize a problem regarding the contract. The contractor and the CO labor to settle the problem and avoid litigation. Although there is sometimes an air of adversity in the relationship between the CO and the contractor, their efforts to resolve their differences amicably reflect a mutual desire to achieve a result acceptable to both. This negotiation process often involves requests for information by the CO or Government auditors or both, and, inevitably, this exchange of information involves costs for the contractor. These costs are contract administration costs, which should be allowable since this negotiation process benefits the Government, regardless of whether a settlement is finally reached or whether litigation eventually occurs because the availability of the process increases the likelihood of settlement without litigation.

*Bill Strong*, 49 F.3d at 1550.

Sygnos relies exclusively on *Reflectone* and AEI's admission that Excell was hired to prepare REA No. 2 to support its claim that Excell's costs are not allowable because they were utilized in connection with a "claim" against the Government. However, *Reflectone* addressed only one aspect of the definition of "claim"—the pre-existing dispute requirement. While *Reflectone* did away with the pre-existing dispute rule of *Bill Strong*, it did not unequivocally hold that an

MEMORANDUM DECISION AND ORDER - 35

REA is a "claim" for purposes of FAR 31.205-33. Nor could the *Reflectone* Court so hold it in light of the federal regulations. For instance, under FAR 2.101, a "claim" for over $100,000 also requires certification before it can be considered a CDA claim. The certification required for an REA differs from that required for a claim under the CDA. *Johnson v. Advanced Engineering & Planning Corp., Inc.*, 292 F.Supp.2d 846, 853-54 (E.D. Va. 2003).

Simply stated, the fact AEI hired Excell to prepare REA No. 2 does not establish, for purposes of summary judgment, that Excell's services were incurred in connection with the prosecution of a CDA claim. The analysis in *Bill Strong*, regarding whether costs are incidental to contract administration, or incidental to prosecution of a contract claim—even if such costs are incurred in preparing and REA—remains good law despite *Reflectone*. *Tip Top*, 695 F.3d at 1283 n. 3*; see also Johnson,* 292 F.Supp.2d at 853-54. The relevant inquiry is whether Excell's services were incurred for the genuine purpose of materially furthering the negotiation process, and were thus contract administration costs allowable under FAR 31.205-33, or whether AEI instead incurred Excell's costs in order to promote the prosecution of a CDA claim against the Government, in which case Excell's costs would be unallowable.

Here the record on summary judgment is not clear whether REA No. 2 was submitted to facilitate pre-claim negotiations, or whether it was used to form the

basis for submitting the ultimate CDA-certified claim. It appears REA No. 2, and the services Excell contributed to preparing REA No. 2, may have served both purposes. As the Court in *Johnson* noted, consulting services may serve a dual function: "first, by facilitating pre-claim negotiations using [an initial REA], and second, by partly forming the basis for submitting the updated CDA-certified… REA." 292 F.Supp.2d at 855-56. The costs incurred for the former purpose would constitute allowable contract administration costs, while the costs incurred for the latter would be unallowable costs incurred to promote prosecution of a claim against the Government. While both AEI and Sygnos's submissions on summary judgment lack the information necessary for the Court to distinguish between those services Excell provided in furtherance of negotiations, versus those services utilized to promote prosecution of a claim against the Government, Sygnos has the burden on summary judgment to establish Excell's services were unallowable costs. Sygnos has not met this burden and the Court accordingly denies summary judgment on this point.

### B. FAR 31.205-33(f)

Sygnos contends even if Excell's consulting costs are deemed allowable, AEI failed to satisfy the documentation requirement of FAR 31.205-33(f) in submitting Excell's costs to Sygnos. Under this provision:

> (f)  Fees for services rendered are allowable only when supported by evidence of the nature and scope of the service furnished (see also 31.205-38(c))…. Evidence necessary to determine that work performed is proper and does not violate law or regulation shall include—
> (1) Details of all agreements (e.g., work requirements, rate of compensation, and nature and amount of other expenses, if any) with the individuals or organizations providing the services and details of actual services performed;
> (2)  Invoices or billings submitted by consultants, including sufficient detail as to the time expended and nature of the actual services provided; and
> (3)  Consultants' work products and related documents, such as trip reports indicating persons visited and subjects discussed, minutes of meetings, and collateral memoranda and reports.

FAR 31.205-33(f).

Sygnos contends "AEI did not provide the necessary and sufficient documentation for AEI to make a claim for Excell's fees (and therefore, for Sygnos to be able to effectively recover Excell's fees from the VA).  Rather, AEI provided for evaluation by the VA only a collection of nondescript billing summaries, which neither show the detail of time expended by Excell on the Phase III Project nor include any documentation to demonstrate Excell's work product." (Dkt. 41-1, pp. 13-14.)  AEI counters that it did provide Sygnos with the invoices it received from Excell.  AEI's President, Mr. Sweig, submitted a declaration stating:

> Before September of 2014, I provided summaries of the bills I received from Excell (from the invoice recap section of bills) to Darin Walters at Sygnos.  I marked up the summaries to indicate which part of the bills were attributable to work done by Excell for the Project.  I determined what portion of the bills were attributable to the consulting work done for the Project by examining the descriptions of the work performed as set forth in the bills.  A true and correct copy of the marked up bills that I sent to Darin Walters is attached hereto as Exhibit E.  At no time prior to April of 2015 (after Sygnos

resolved its claim with the VA) did anyone from Sygnos ask for further or different information pertaining to the services or the bills for Excell Consulting.

(Dkt. 45-1, ¶ 16.)

AEI also notes it again provided invoices from Excell with notations as to what amounts were chargeable to the Phase III Project in response to two requests for documentation by Sygnos in September and November 2014. (Dkt. 45, p. 8).

The Court has reviewed the "marked up" invoice recap sections of Excell's bills that AEI provided to Sygnos. (Dkt. 45-3, pp. 100-117.) While the invoice recaps do contain notations allocating portions of Excell's monthly bills from March 2012 to May 2013 between the Phase I and Phase III Projects, the invoice recaps only include the total amount of work Excell did for AEI each month, and do not include any detail of the nature of the work performed. Nor do the additional documents AEI sent Sygnos in September and November of 2014 include descriptions of the work performed by Excell.

As Sygnos notes, Excell's President, Mr. Balch, who performed the majority Excell's work for AEI, admitted in his deposition that Excell's invoices would be necessary for the Government to evaluate the reasonableness of Excell's fees. (Dkt. 41-9, p. 13.) When Mr. Balch was asked whether he would agree that production of detailed, itemized invoices would be essential under the applicable FAR, Mr. Balch confirmed, "I sure would. Absolutely." (*Id*.) When asked "if

those documents were missing, then the Government wouldn't have anything upon which to base a determination that your fees were reasonable?" Mr. Balch responded, "That's true." (*Id*.) AEI has not refuted Sygnos's claim that it never provided Sygnos with descriptions of the specific work performed by Excell on the Phase III Project.

AEI attempts to blame Sygnos for allegedly failing to advise AEI that the information it provided regarding Excell's bills was deficient. (Dkt. 45, p. 9.) AEI argues Sygnos should be estopped from claiming AEI failed to comply with FAR 31.205-33(f) because AEI repeatedly provided documentation in response to Sygnos's requests and expressly asked Sygnos to identify any documents it believed were missing. (*Id*.) However, AEI's own consultant testified that itemized invoices would be indispensable in order for the Government to evaluate the reasonableness of Excell's fees. (Dkt. 41-9, p. 13.) AEI's failure to ever provide Sygnos with detailed invoices is inexplicable in light of such testimony. Moreover, Sygnos did specifically advise AEI of the necessity of Excell's invoices, including the need for sufficient detail as to the time expended by Excell and the nature of the actual services provided. For instance, on March 11, 2014, Sygnos asked AEI to supplement its REA submission with a number of documents, including Excell's invoices. (Dkt. 41-9, Ex. E, pp. 30-31) (noting "The charges

claimed by Excell do not have as support documentation of any of the foregoing.")[10]

AEI also argues that it must have submitted sufficient documentation of Excell's services or the VA would not have awarded Sygnos "approximately $155,000.00 as compensation for Excell's costs." (Dkt. 45, p. 9.) AEI cites the deposition testimony of Mr. Walters in support of this contention. (*Id.*) In the testimony AEI cites, Mr. Walters does not confirm the Government awarded $155,000 to cover Excell's costs, and is interrupted when he attempts to clarify his response. (Dkt. 45-6, p. 6.) Elsewhere in his deposition, Mr. Walters confirms the Government did not find the documentation submitted by AEI sufficient. For instance, when asked: "What did they say about what they were going to pay… that was attributable to something that your subcontractors were claiming?" Mr. Walters responded: "They said that they, honestly—that the data provided by the subcontractors was—and I'll tell you exactly the term they used—a pile of crap, and they were unable to make a reasonable determination of what was really due. And so they made a best guest estimate as best as they could determine based upon what there was to provide something for the subcontractors." (Dkt. 43-4, p. 4.) Moreover, as previously noted, none of the documents issued by Sygnos or the VA

---

[10] The "foregoing" referenced in the March 2014 letter was a direct quotation of FAR 31.205-33(f).

specifically allocated any part of the $304,641.01 awarded to cover subcontractor expenses to specific costs, including consulting costs. (Dkt. 43-6, Ex. D, pp. 16-19.) AEI's claim that the VA awarded $155,000 to cover Excell costs is not adequately supported and is insufficient to withstand summary judgment.

Based upon the plain language of FAR 31.205-33(f), the corroborating testimony of AEI's consultant, and the undisputed fact that AEI did not provide Sygnos with Excell's itemized billings or any other detailed description of Excell's work on the Phase III Project, the Court must grant Sygnos's request for summary judgment. AEI may not recover Excell's consulting fees due to its failure to comply with FAR 31.205-33(f). Given this holding, the Court need not address Sygnos's claim that neither Sygnos nor Western Surety can be obligated to pay for consultant fees that were not agreed upon in the subcontract.

## C. Cap on AEI's Damages

Sygnos also seeks summary judgment limiting AEI's damages to the $304,641.01 Sygnos recovered from the VA for subcontractor costs. Sygnos suggests a provision in the Sygnos/AEI subcontract expressly limits AEI's damages to those secured by Sygnos from the VA. Specifically, §10 of the Terms and Conditions section of the subcontract provides:

> With respect to any dispute involving the [VA], Sygnos, Inc. reserves the right to resolve the dispute under the disputes provision of the [Prime Contract] and Subcontractor shall be bound by such resolution.

(Dkt. 41-5, p. 6.)

In its Motion for Partial Summary Judgment, Sygnos suggests: "Because Sygnos negotiated in good faith AEI's damages claims based upon the information provided, and because Sygnos was able to obtain a favorable result for AEI, neither Sygnos nor Western Surety should be held liable for any amount greater than the result paid by the VA." (Dkt. 41-1, pp. 18-19.)

AEI responds that §10 of the subcontract constitutes an invalid waiver of Miller Act rights and is therefore unenforceable. Specifically, the Construction Industry Payment Protection Act of 1999, 40 U.S.C. § 270b, amended the Miller Act to include a provision specifying the requirements for a valid waiver of Miller Act rights.[11] *U.S. for Use and Benefit of Walton Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1208 n. 3 (2002). As amended, the Miller Act provides:

> (c) Waiver of right to civil action. A waiver of the right to bring a civil action on a payment bond required under this subchapter is void unless the waiver is—
> (1) in writing;
> (2) signed by the person whose right is waived; and
> (3) executed after the person whose right is waived has furnished labor or material use in the performance of the contract.

40 U.S.C. § 3133(c).

---

[11] In 2002, 40 U.S.C. § 270b was amended and re-codified at 40 U.S.C. § 3133. PL 107-217 (HR 2068).

Under the aforementioned provision, a subcontractor can waive its Miller

Act rights only *after* it has furnished labor or materials for use in the performance

of the contract.  This provision prevents prime contractors from requiring that

subcontractors waive their Miller Act rights as a precondition to obtaining work on

federal projects.  *U.S. v. Zurich American Ins. Co*., 99 F.Supp.3d 543, 549 (E.D.

Pa. 2015).  "'[T]he requirement that any waiver be executed after completion of

the subcontractor's work would be meaningless if general contractors could simply

craft subcontract provisions that effectively preclude Miller Act suits.'"  *Id*.

(quoting *U.S. ex rel. Glass, Inc. v Patterson*, 2014 WL 442853, at \*3 (E.D. Pa.

2014).

As AEI notes, AEI and Sygnos entered into the subcontract on or about

October 21, 2010.  The subcontract was executed long before AEI (or its

subcontractors) furnished any labor or materials for use in the performance of the

subcontract, as the VA did not even issue the Notice to Proceed until May 2011.

(Dkt. 45-1, ¶ 4.)  As such, the waiver set forth in §10 of the subcontract is

unenforceable under the Miller Act and cannot limit AEI's damages to the

$304,641.01 obtained by Sygnos from the VA.  Sygnos appears to agree, as it

failed to respond to AEI's argument regarding the unenforceability of §10 in its

Reply brief, and, in its Reply, limits its request for summary judgment to the claim

"Sygnos is entitled to partial summary judgment on AEI's claim for consulting

costs related to the Phase III Project."[12]  (Dkt. 50, p. 10.)  The Court accordingly

denies judgment limiting AEI's damages claim to no greater than the amount

awarded by the VA.

### III.    Defendants' Motion for Partial Summary Judgment Regarding Damages Claims of Tri-State (Dkt. 42)

In addition to its claims against AEI, Tri-State brings a Payment Bond claim

against Western Surety and an unjust enrichment claim against Sygnos.

Defendants argue such claims are directly contrary to Tri-State's contractual rights

under its subcontract with AEI.  Specifically, Section 6.5 of the AEI/Tri-State

subcontract contained a "no damage for delay" clause stating:

> If progress of the Subcontractor's Work is substantially delayed without the
> fault or responsibility of the Subcontractor, then the time for the
> Subcontractor's Work shall be extended by written Change Order to the
> extent such change is able to be obtained by the Contractor under the
> Contract Documents and the Schedule of Work shall be revised accordingly.
> The Contractor shall not be liable to the Subcontractor for any damages or
> additional compensation as a consequence of delays caused by any person
> not a party to this Agreement unless the Contractor has first recovered the
> same on behalf of the Subcontractor from said person.  *The Subcontractor's
> sole and exclusive remedy for delay shall be an extension in the time for
> performance of the Subcontractor's work.*

---

[12] In its Reply, Sygnos in fact reverses its argument that AEI's damages must be
capped at the amount awarded by the VA, and instead argues AEI is not entitled to in any
way rely on Sygnos's settlement with the VA when proving its damages.  (Dkt. 50, pp. 3-
5.)  As this argument was not set forth by Defendants in their moving papers, the Court
will not, on summary judgment, make a determination as to AEI's ability to rely on the
VA/Sygnos settlement when proving damages at trial.  *Koerner v. Grigas*, 328 F.3d 1039,
1048 (9th Cir. 2003).

(Dkt. 42-16, Ex. J, p. 8) (emphasis added).

Defendants suggest the above-referenced provision precludes Tri-State's ability to recover from either Sygnos or Western Surety.[13]   Tri-State responds Defendants' argument fails as a matter of law and fact.

_____

[13] In its opening brief, Defendants also argued Section 5.2.4 of the AEI/Tri-State subcontract limited Tri-State's ability to recover.  This provision stated, in part:

> In consideration of all of the covenants and conditions of this Agreement and the full, faithful and prompt and timely performance of the Subcontractor's Work and all of the terms and conditions of this Agreement and the Contract Documents pertaining to the Subcontractor's Work, Contractor agrees to pay to Subcontractor the Contract Price as hereinabove set forth, and *Subcontractor agrees to receive and accept the Contract Price as full compensation for doing all things required to complete the Subcontractor's Work* to the satisfaction of the Owner and the Contractor….

(Dkt. 42-16, pp. 5-6) (emphasis added).

Tri-State responds, and the Court agrees, that the aforementioned provision is unenforceable to the extent Defendants interpret it as a waiver of Tri-State's Miller Act rights.  *Walton,* 290 F.3d at 1203; *see also supra*, Section II.C.  Defendants appear to concede this position, as their Reply brief argues only the "no damage for delay" clause precludes Tri-State's recovery.

Defendants also argued in their opening brief that they were contractually insulated from paying any claims of Tri-State due to the indemnity clause in the AEI/Sygnos subcontract.  (Dkt. 42-1, pp. 10-13.)  In response, Plaintiffs note Defendants fail to cite any authority for the proposition that an indemnity clause with a third-party can somehow affect a party's liability in connection with the claims for which indemnity is sought.  (Dkt. 46, p. 6.)  Defendants have not provided such authority and summary judgment is accordingly inappropriate on this claim.  Moreover, Defendants appear to concede the point by omitting the indemnity argument from their Reply.  The Court will focus on the "no damage for delay clause," as it is the only contractual provision Defendants address in their Reply brief.

## A. No Damage for Delay Clause

Defendants argue Tri-State unequivocally agreed that its "sole and exclusive" remedy for delay was an extension in the time of performance of its work. (Dkt. 42-1, p. 7.) Defendants suggest no damage for delay clauses "are used to assign the risk of delays, for whatever cause, upon one of the contracting parties, with the assumption that the party bearing the risk has bargained for a price that covers the burden of carrying the risk." (*Id.*) (quoting *Kiewit Constr. Co. v. Capital Elec. Constr. Co.*, 2005 WL 2563042, at *26 (D. Neb. 2005)). Tri-State counters the no damage for delay clause constitutes an unenforceable waiver of Miller Act rights. Tri-State also argues even if not deemed an unenforceable waiver, no damage for delay clauses are unenforceable, where, as here, a project is abandoned and/or delays are unreasonably lengthy and beyond contemplation of the parties.

No damage for delay clauses exculpate an owner from liability for damages resulting from delays in the performance of the contractor's work by ordinarily limiting a contractor's remedy to an extension of time. *See* 13 Am. Jur. 2d Building and Construction Contracts §§ 58-59 (2009). Such clauses are common in public contracts and are recognized as valid and enforceable when they satisfy the ordinary rules governing contracts. *John E. Green Plumbing & Heating Co., Inc. v. Turner Constr. Co.*, 742 F.2d 965, 966 (6th Cir. 1984). However, because

such clauses are exculpatory, they are strictly construed against the party that relies upon them.  *Id.*

### 1.  Waiver

Tri-State cites *U.S. v. Safeco Ins. Co. of Am.*, 2013 WL 5970435 (W.D. Kentucky 2013) to support its claim that the no damage for delay clause in the AEI/Tri-State subcontract is unenforceable.  Tri-State suggests the no damage for delay clause is unenforceable to the extent it operates to waive Tri-States rights under the Miller Act since the waiver provision was signed before the work on the Phase III Project took place.  The *Safeco* Court held a no damage for delay clause in a subcontract "effectively amounts to a waiver of [plaintiff's] right to bring an action on the payment bond.  Though the Subcontract is in writing and was executed by [plaintiff], it was not executed after [plaintiff] performed masonry work on the Project.  As such, the no-damage-for-delay clause…would appear void under [40 U.S.C. § 3133(c)]."  *Id.*, at *3.

Defendants respond Tri-State's argument ignores longstanding case law relating to the freedom of contract.  In support, Defendants cite two cases decided before the Miller Act was amended in 1999 to include the provision specifying the requirements for a valid waiver of Miller Act rights.  (Dkt. 51, pp. 5-6.)  As such, the cases Defendants rely upon are not particularly helpful to consideration of

whether the no damage for delay clause constitutes an unenforceable waiver under the Miller Act.

Defendants also note that while various states have enacted statutes which either severely limit or outright void the enforceability of no damage for delay clauses, Idaho has not adopted any statutory prohibition on contract terms containing clauses with limitations on a party's right to delay damages. Nor has any Idaho case construed the enforceability of a no damage for delay clause in light of the Miller Act. In the absence of such authority, the Court may look to decisions in other jurisdictions. Defendants, who carry the burden of persuasion on their Motion for Partial Summary Judgment, do not provide any relevant citation to published authority to support the claim that the no damage for delay clause is not an unenforceable waiver of Tri-State's right to seek damages under the Miller Act. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The Court accordingly declines Defendants' invitation to create new law and denies summary judgment on this point at this time.

*2. Unreasonably lengthy delay*

Tri-State also argues the no damage for delay clause relied upon by Defendants is unenforceable without regard to the amendments to the Miller Act regarding waiver. Tri-State cites cases holding no damage for delay clauses unenforceable when the delays amount to an abandonment of the project, or are

unreasonably lengthy and beyond the contemplation of the parties. (Dkt. 46, p. 4) (citing *Hawley v. Orange Cnty. Flood Control Dist.*, 27 Cal.Rptr. 478 (Cal. App. Ct. 1963); *Jensen Const. Co. v. Dallas Cnty.*, 920 S.W.2d 761 (Tx. App. Ct. 1996)).

A majority of jurisdictions have adopted certain exceptions to the enforceability of no damage for delay clauses. Brunner, *Validity and Construction of "No Damage" Clause with Respect to Delay in Building or Construction Contract*, 74 A.L.R. 3d 187, § 2[a] (1976). These exceptions include: (1) delays so unreasonable in length as to amount to project abandonment; (2) delays caused by the other party's fraud, misrepresentations, concealment or other bad faith; and (3) delays caused by the other party's active interference. *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1015 (Nev. 2004). Tri-State maintains the first exception to enforceability applies here because the delays to the Phase III Project were so unreasonably long that both Tri-State and AEI desired to abandon the project and encouraged Sygnos to request that the Prime Contract be terminated by the Government for convenience.

As Sygnos notes, the VA/Sygnos Prime Contract contained an express provision governing termination of the Prime Contract by the VA for the Phase III Project. Likewise, the general conditions to the Prime Contract allowed the Contracting Officer to terminate the contract for the convenience of the VA. (*Id.*)

Neither the VA nor the Contracting Officer ever notified Sygnos that the Government was terminating the contract, and work was never "abandoned" on the Phase III Project. Although the VA suspended work several times in 2012, these suspensions were made under contractual provisions that permitted the Contracting Officer to suspend work without terminating the contract. Moreover, work continued on the Phase III Project through 2013. Regardless of whether AEI and Tri-State desired to abandon the project, the record shows the Phase III Project was never abandoned by the VA. Thus, the first exception to enforceability of no damage for delay clauses does not apply.

Tri-State also suggests the no damage for delay clause is unenforceable because the delays here were unreasonably lengthy and beyond the contemplation of the parties. Courts are largely divided on whether no damage for delay clauses are unenforceable where delays are beyond the contemplation of the parties at the time they entered into the contract. *Compare Corinno Civetta Constr. v. City of New York*, 502 N.Y.S. 2d 681, 686 (N.Y. App. 1986) ("It can hardly be presumed… that the contractor bargained away his right to bring a claim for damages resulting from delays which the parties did not contemplate at the time.") *with John E. Gregory & Son, Inc. v. Guenther & Sons Co., Inc.*, 432 N.W.2d 584, 587 (Wis. 1988) ("[T]he adoption of a 'no damage for delay' clause shows that the parties realize that some delays cannot be contemplated at the time of the drafting

of the contract. The parties include the clause in the contract in order to resolve problems conclusively should such delays occur."); *see also Hawley*, 27 Cal.Rptr. at 481-483 (collecting cases).[14]

Several federal cases have rejected the notion that no damage for delay clauses provide absolute immunity for damages where delay is exceptionally unreasonable. *See, e.g., Ross Eng'g Co. v. U.S.*, 92 Ct.Cl. 253, 261 (Ct.Cl. 1940) (plaintiff entitled to recover damages incurred due to unreasonable delay of 70 days between contract execution and issuance of notice to proceed ); *F.H. McGraw & Co. v. U.S.*, 130 F.Supp. 394, 398 (Ct.Cl. 1966) (delay of 159 days in authorizing changes to specifications was unreasonable and U.S. would be held liable in damages to contractor for delay over a month); *American Pipe & Constr. Co. v. Westchester Cnty.*, 292 F. 941, 952 (2d Cir. 1923) (contractor entitled to damages for unreasonable delay in excess of three months); *Berger Enter. v. Zurich Am. Ins. Co.*, 845 F.Supp.2d 809, 821(E.D. Mich. 2012) (under Ohio law, no damage for delay provision was unenforceable where delay was not at all contemplated by the parties). Whether delay in a particular case was reasonably contemplated is a question of fact for the jury. *Ross*, 92 Ct.Cl. at 260; *see also*

---

[14] Various states have enacted statutes which either severely limit or outright void the enforceability of no damage for delay clauses. *See, e.g.*, Wash. Rev. Code §4.24.360; Ariz. Rev. Stat. §41-2617; Vernon's Ann. Missouri Stat. §34.058.2; North Carolina, Gen. Stat. §143-134.4. Idaho has not adopted a statutory prohibition on contract terms containing clauses with limitations on a party's right to recover delay damages.

*JWP/Hyre Elec. Co. of Indiana v. Mentor Village Sch. Dist.*, 968 F.Supp. 356, 360

(N.D. Ohio, 1996).

Tri-State has submitted evidence to establish a genuine issue of material fact

as to whether the delay in this case was reasonably contemplated by the parties.

The Phase III Project was intended to be performed in 240 days. (Dkt. 43-2, ¶ 4.)

Instead, the project took more than 950 days to perform. (*Id.*, ¶ 24.) Tri-State's

President, Max Stith, submitted a declaration stating: "At the time that [Tri-State]

executed [the subcontract]… I had no reason to believe that the completion of the

Project would be delayed over 690 days." (Dkt. 46-1, ¶ 7.) AEI's President, Mr.

Sweig, submitted a declaration stating:

> At the time that I executed the [Tri-State/AEI] Subcontract on behalf of AEI,
> I reasonably anticipated that the application of the no damage for delay
> clause set forth at paragraph 6.5 of the [Tri-State/AEI] Subcontract would
> possibly be applicable in an instance where the Project was delayed by one
> or two weeks, not delays in excess of that, and certainly not delays in excess
> of 690 days. The delays in completing the Project were over three times the
> amount of time originally allotted for completion of the work on the Project.

(Dkt. 46-2, ¶ 9.)

The Court cannot find the no damage for delay clause enforceable as a

matter of law where both parties who agreed to the clause suggest the

extraordinary delay on this project was well beyond their contemplation when they

executed their subcontract. Moreover, Sygnos's President, Mr. Sheely, admitted

"incredible delays and impacts" were encountered on the Phase III Project. (Dkt.

46-3, Ex. C, p. 45.)  The Court declines to enter judgment for Defendants' on Tri-State's damages claims.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

1.  AEI's Motion for Partial Summary Judgment (Dkt. 43) is **DENIED**;

2. AEI's Motion to Strike (Dkt. 53) is **MOOT** and is therefore **DENIED**;

3. Defendants' Motion for Partial Summary Judgment Regarding Damages Claims of AEI (Dkt. 41) is **GRANTED** in part and **DENIED** in part. Summary judgment is **GRANTED** finding AEI is not entitled to recover Excell's costs due to AEI's failure to comply with FAR 31.205-33(f). Summary Judgment is **DENIED** in all other respects;

4. Defendants' Motion for Partial Summary Judgment Regarding Damages Claim of Tri-State (Dkt. 42) is **DENIED;**

5. Jury trial is set for May 16, 2017 at 9:30 a.m., at the James R. McClure Federal Courthouse in Boise, ID.  The parties shall contact the Court's ADR Coordinator, Keith Bryan, within thirty (30) days of the date of this Order if they seek to pursue mediation or desire a settlement conference.

Dated: **January 11, 2017**

Honorable Edward J. Lodge
United States District Judge